UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -  X
                                               :

**E.B., an Individual and an American Airlines passenger,**   :

                   :    **Case No.**

              **Plaintiff,**   :

         **- against -**   :

                   :

**AMERICAN AIRLINES, INC., a Delaware corporation doing business in New York; REPUBLIC AIRWAYS, INC., an Indiana corporation doing business in New York; and DOES 1-8,**   :

              **Defendant.**   X

- - - - - - - - - - - - - - - - - - - - - - - - - - -

## COMPLAINT

COMES NOW Plaintiff, E.B., an individual in his own right, by and through the undersigned counsel, who brings this Complaint against Defendants AMERICAN AIRLINES, INC., a Delaware corporation, doing business at LaGuardia Airport in Queens County, New York, REPUBLIC AIRWAYS, INC., an Indiana corporation, doing business at LaGuardia Airport in Queens County, New York, and DOES 1-8, for various acts and omissions which occurred on a flight to and around LaGuardia Airport, and at LaGuardia Airport.

## JURISDICITION

1.     This is an action for damages in excess of Seventy-Five Thousand and 00/100 Dollars ($75,000.00), exclusive of interest, costs, and attorney's fees.

2.     Jurisdiction exists over this action and AMERICAN AIRLINES, INC., REPUBLIC AIRWAYS, INC., AND DOES 1-8, under 28 U.S.C. §§ 1331 AND 1332.

## VENUE

3.      Venue is proper under 28 U.S.C. § 1391 because the Plaintiff is a resident of this District and Defendants conduct significant business within this District and are subject to personal jurisdiction in this District.  All conditions precedent to bringing this action have been met.

## PARTIES

4.      Plaintiff is a citizen of the United States of America and a resident of Kings County in the State of New York, and on October 9, 2021, was a fare paying airline passenger traveling on Defendants' scheduled service.

5.      Defendant American Airlines, Inc. (hereinafter referred to as "American") is a corporation formed and organized under the laws of Delaware.  Defendant American Airlines, Inc. conducts business at the LaGuardia Airport in East Elmhurst, Queens, in the County of Queens, in the State of New York and maintains a registered agent in the State of New York.

6.      Defendant Republic Airways, Inc. (hereinafter referred to as "Republic") is a corporation formed and organized under the laws of Indiana.  Defendant Republic conducts business at the LaGuardia Airport in East Elmhurst, Queens, in the County of Queens, in the State of New York and maintains a registered agent in the State of New York.

7.      Defendants American and Republic are common carriers and owe their passengers, including Plaintiff, the highest degree of care.

8.      Defendants American and Republic operate scheduled passenger air carrier service in the airspace of the United States of America and therefore, pursuant to 49 U.S.C. §40103, a citizen of the United States has a public right of transit through all such manageable airspace.

9.    Defendant American promotes and advertises products and services through various media sources and invites the public to purchase tickets on various American flights. Republic operates some of those flights for Defendant American, including the flight at issue herein.

10.    Defendants DOES 1-8 include persons whose identity and address for service of process are currently unknown to Plaintiff but whose acts and omissions on the flight, caused and contributed to the damages herein. Plaintiff anticipates their identities will be revealed by the discovery herein. Plaintiff will seek leave of this Honorable Court to timely amend the Complaint in accordance with this Honorable Court's rules and orders if and when appropriate.

## BACKGROUND

### Mass Hysteria

11.    In high school in the United States of America, many Americans first learn about mass hysteria by reading about the Salem Witch Trials of 1692-1693, in *The Crucible*.[1]

12.    In The Crucible, a young woman wreaked havoc and vengeance on her neighbors after she was discovered and disciplined for trying to be with the man she loved. When she was prevented from re-uniting with the man, she falsely accused of crimes the person who was between her and her man. The accusations escalated and stunningly, without any evidence and with no proof there was any crime committed, many others believed the accuser and repeated her accusations, with no evidence and with no effort to ascertain the truth. Common sense, reason, and reality were suspended, and as others joined and repeated the accusations, the falsehoods and embellished the alleged crimes.

---

[1] Miller, Arthur, The Crucible, (Dramatists Play Service, Inc., New York, 1952).

3

13.     The Crucible asked an important question, "Is the accuser always holy now?"[2] Apparently on American Airlines and Republic Airways, whose flight attendants and pilots could not be bothered to walk 8 rows, less than 20 feet,[3] to check out the accuser's story, or say even one word to the falsely accused passenger, or to let him know what was going on about him.

14.     On American Airlines and Republic Airways, as in Salem, Massachusetts, all it took to be condemned was to be accused. And so it was for Plaintiff E.B. on October 9, 2021.

15.     A particular form of mass hysteria is called moral panic or anxiety hysteria, which is the phenomena of people becoming distressed about a perceived unreal or exaggerated threat.

**Propagators of Mass Hysteria**

16. Some research concludes instances of mass hysteria are more prominently experienced and spread by groups of women. Researchers theorize women may be more exposed to collective obsessional behavior because they are exposed to more stress and stressful work situations and mass hysteria events are a way of resistance and a way out of their stressful work situation.

17.     And so it was on October 9, 2021, on Flight 4817 – a female passenger started the false accusations; the flight attendants bought in and embellished the false claims convincing the 3 pilots on board, who could not be bothered to check out the facts, but the pilots caused the hysterical fiction to be transmitted as fact to the FAA, law enforcement and first responders.

**Stopping Mass Hysteria**

---

[2] *Id.*, page 44.
[3] The flight attendants were in the back and front of the plane. The Plaintiff was in Row 13, but the rows were not numbered consecutively. There were only 17 rows on the plane.

18. Psychologists and sociologists conclude that mass hysteria in workplaces and social gathering is resolved by providing reassurance that the environment is safe. Mass hysteria is often of short duration and follows the perception and a redefinition of a harmless stimulus into a dangerous and collective delusion. Enclosed settings are conducive to outbreaks of hysteria, especially when rigid discipline and extenuating work or excessive demands are imposed.

19. Thus, preventing mass hysteria can be as simple as quickly ruling out any real threat. But the pilots and flight attendants on Flight 4817 did nothing to rule out the threat. The pilots and flight attendants escalated, embellished, and further exaggerated the unreal and invented threat. The Defendants and their employees, contractors and agents caused the mass hysteria event that egregiously, and without any evidence, harmed E.B.

## FACTS

20. On or about October 9, 2021, Plaintiff was a passenger on American Airlines Flight 4871, from Indianapolis, Indiana to LaGuardia Airport in New York. American Airlines Flight 4871 was operated by Defendant Republic Airlines.

21. Plaintiff was traveling that day because he had been visiting his mom and dad in Indianapolis.

22. Plaintiff was a fare paying passenger on this flight.

23. As a passenger on a commercial carrier, the Defendant airlines and their employees, contractors and agents, owed to Plaintiff the highest duty of care.

24. Plaintiff did not violate any FAA regulations or any American or Republic rules or guidelines.

25.     Plaintiff did not refuse any requests or commands of any gate, counter, cabin, or flight agent or crew, or any other employee, contractor, or agent of any Defendant.

26.     Plaintiff did not refuse any request or command of the Federal Aviation Administration (FAA), of the Federal Bureau of Investigation (FBI) of any law enforcement or emergency responder.

27.     After the aircraft door was closed after boarding Flight 4871, no employee of Defendants American Airlines or Republic Airways, or any of their employees, agents, contractors, or other representatives, spoke to Plaintiff, made any requests, asked Plaintiff any questions, asked to see Plaintiff's property, or asked Plaintiff if he had alleged items, or did alleged behaviors.  Defendants had no interaction whatsoever with Plaintiff during the flight.

28.     A harbinger of the hell to come, Plaintiff was assigned to Row 13.

29.     There were 5 people in Row 13:

   a).     Plaintiff was assigned and seated in 13D, the aisle seat;

   b).     A woman with an infant was seated in seat 13F, the window seat;

   c).     A man alleged to be the husband of the woman in 13F was across the aisle but also seated in Row 13 on the aisle; and

   d).     A toddler sized child believed to be the child of the man and woman in Row 13 was seated in Row 13 in the window seat.

30.     And so was the composition of Row 13, in the middle of the small plane, just eight rows from the front and back ends of the plane, because the aircraft row numbering skipped several row numbers after first class.

31.     During Flight 4871, Plaintiff was left in the dark and unaware of accusations being hurled against him by a woman in his row on the flight and by Defendants' flight attendants and

pilots. Defendants and their employees, contractors and agents, never once gave Plaintiff the courtesy of speaking with him to find out if the accusations against him had any basis in fact or reality.

32. Of course the allegations were false.

33. Nonetheless the Defendants and their employees, contractors, and agents transmitted the false allegations, which Defendants never bothered to investigate or speak so much as one word to Plaintiff during the flight. Defendants repeated and transmitted, and caused to be repeated and transmitted, the false allegations to Air Traffic Control, to the FAA, to law enforcement, to first responders, and/or to others to set off a horrific chain of events against Plaintiff.

34. Plaintiff sat in his assigned seat the entire flight except for a very brief trip to the bathroom, which bathroom visit was quickly and properly made while the fasten seat belt light was not illuminated.

35. When Plaintiff used the bathroom, he was quick, flushed, washed his hands, disposed of his paper towel, and left the bathroom clean and in order, expending only a minute or two in the lavatory.

36. When Plaintiff boarded the plane, he boarded with his backpack shown here:



When Plaintiff boarded the plane, he boarded with his cell phone. His cell phone, was a common iPhone identical or similar in appearance to millions of iPhones used around the world by tens of millions of people and carried on board flights by hundreds of thousands of passengers every day. His cell phone is shown here:



When Plaintiff boarded the plane, he boarded with is camera, shown here:



When Plaintiff boarded the plane he boarded with his skateboard, shown here:



Plaintiff's exact appearance on the day of the flight, including the exact clothing he was wearing, is shown here:



37.     Soon after Plaintiff boarded the plane, an on-board announcement was made that the flight might be full, and that Defendants would like to check additional carry-ons to make room in the overhead bins. Plaintiff decided to check his skateboard to free up bin space for others and in case there was not sufficient space to stow a skateboard. Plaintiff took his skateboard to the front of the plane and gave his skateboard to one of Defendants' flight attendants. Plaintiff spoke to the flight attendant and was pleasant, polite, and cooperative. The flight attendant spoke to Plaintiff and took his skateboard. He promptly returned to his seat.

38.     At all relevant times herein Plaintiff was observable by Defendants, including while Plaintiff waited in the boarding area, boarded the plane, found his seat, sat down, brought his

skateboard to the front of the plane to check, observed and complied with the preflight procedures, stowed his backpack under the seat immediately in front of him, put his camera in his backpack on the floor under the seat in front of him, shut off his phone, fastened his seat belt, and sat quietly awaiting takeoff. Plaintiff was polite, well behaved and cooperative.

39.     During the time before takeoff Defendants reported nothing unusual, amiss, improper, disorderly, remarkable, memorable, odd, questionable, illegal, or threatening about Plaintiff or his behavior, his phone, his camera, his backpack, his skateboard, or anything else about or concerning Plaintiff.

40.     After checking his skateboard, no Defendant and no employee, agent, or contractor of Defendants', spoke to Plaintiff at any time during the flight, not even for cabin service, because Plaintiff was sleeping or dozing for most of the flight.

41.     Plaintiff was not acquainted with, related to, or associated with any other person on the flight. Plaintiff minded his own business and did not show any passenger in Row 13, or elsewhere on the plane, anything on his phone or his camera. Plaintiff did not converse with the passengers in Row 13, or anyone else on the plane, except when the passenger in 13F made requests of Plaintiff as herein below detailed. Plaintiff never asked any other passenger on the flight to do anything for him.

42.     The problems the flight crew had with the woman passenger in seat 13F, started when the woman passenger 13F changed her seat without Defendants' permission. Passenger 13F asked Plaintiff to let her out (of Row 13) and Plaintiff got up to let her out of Row 13, which Plaintiff did politely and promptly. However, when the woman passenger in 13F attempted to change her seat, a flight attendant came to Row 13 and told the woman, who was holding a baby,

to go back to 13F -- her assigned seat. Plaintiff politely and immediately got up again to let the woman and the baby she was holding back into assigned seat 13F.

43.     On information and belief, the reason the woman could not stay in the seat she chose to move to was because the seat was supposed to be occupied by the small child across the aisle in Row 13. On information and belief, the child was not a lap-baby under the age of two. A child age two or older must have an assigned seat.

44.     Once the plane door closed and the cabin announcements completed, Plaintiff put his camera in his backpack under the seat directly in front of him, set the alarm on his phone to awaken him before landing, and then he tried to sleep for most of the flight.

45.     Plaintiff made no requests of Defendants or any of Defendants' employees, agents, or contractors, or of any other passengers.

46.     Plaintiff did not talk or text on his phone.

47.     Plaintiff did not access any websites or inflight networks, nor did seek any internet connections or websites nor seek to find out if any networks or connections were available, and he does not know if any were available.

48.     Plaintiff did not use the internet nor make any calls while he was on the plane.

49.     Plaintiff was trying to sleep on the plane because he was tired, having spent his time in Indianapolis visiting with his mom, dad and friends.

50.     During the flight Plaintiff slept off and on for approximately an hour but woke up before his alarm on his phone went off because he needed to use the bathroom.

51.     Plaintiff went to the forward lavatory because he saw it was available when he woke up.

52.     The seat belt light was off.

53.     Plaintiff turned off the alarm on his cell phone before it sounded since he was already awake, so as not to disturb the other passengers.  He took only his cell phone with him when he went to the lavatory.  He left his backpack at his seat, appropriately stowed under the seat in front of him.

54.     Plaintiff was quick and efficient in using the lavatory, only therein for a minute or two, washing his hands and promptly leaving the lavatory clean and in good order.

55.     When he got up to use the lavatory, the Flight Attendant in the forward part of the plane, had she chosen to watch Plaintiff, could have easily observed Plaintiff approach, go in the lavatory, and come out of the lavatory.  The seat belt light was off, and no flight attendant or pilot took issue with Plaintiff's use of the lavatory and said nothing to Plaintiff.  Plaintiff's use of the lavatory was permissible and unremarkable.  There was nothing unusual about Plaintiff's behavior.

56.     There was also a "dead-heading" pilot of Defendants' seated in the first row.  The pilot seated in the first row said nothing to Plaintiff.

57.     As with the rest of the flight, not one of the cabin or flight crew or the dead-heading pilot spoke to Plaintiff when he got up to use the restroom.

58.     When Plaintiff returned to his seat from the bathroom, and sat down in his assigned seat, the woman in 13F asked Plaintiff to get up and let her out of Row 13.  Plaintiff politely and promptly did so.  There was no other discussion.  The woman with the baby in her arms went to the rear of the plane.

59.     A short time after the woman left Row 13, Plaintiff noticed flight attendants going in and out of the forward lavatory, the same lavatory Plaintiff had used a few minutes prior.  Flight attendants also opened overhead bins and compartments in the front of the plane.  The Flight Attendants appeared to be searching areas at the front of the aircraft.  Plaintiff assumed someone

misplaced an item or left something in the lavatory, or the Flight Attendants needed something for someone or for service on the plane.

60. None of Defendants' employees, agents, or contractors approached Plaintiff, talked to Plaintiff, or looked at anything Plaintiff brought on board, other than of course his skateboard when Plaintiff checked it with a Flight Attendant during the boarding process.

61. The woman and her baby then returned to Row 13. Plaintiff promptly and politely stood up to allow the woman, to return to seat 13F.

62. The woman asked Plaintiff if he would like the window shade open. Plaintiff said okay.

63. Unbeknownst to Plaintiff, based initially on the word of the woman passenger who made it known to the flight attendants that she was not certain of her allegations, Defendants' and their agents, employees, and contractors, made false statements to FAA, law enforcement and first responders, and others, both in interstate and written communications, falsely stating:

      a). Plaintiff had something dangerous;

      b). Plaintiff was standing up and getting things out of bags;

      c). Plaintiff was timing the flight with his a timing device;

      d). Plaintiff was texting pictures of bombs;

      e). Plaintiff asked to open the shade, so he knew where the flight was;

      f). Plaintiff was looking at pictures of bombs and how to put bombs together;

      g). Plaintiff had a suspicious package onboard;

      h). Plaintiff reached for something suspicious; and

      i). Plaintiff was behaving in a suspicious manner.

64.     In fact, the initial allegations came only from the woman in 13F, which allegations were not backed up by the man in Row 13 believed to be the woman in 13F's husband.

65.     The mass hysterical false statements by Defendants and their falsity included:

a).     that Plaintiff had something suspicious though this came only from the woman passenger in 13F who was not sure, yet Defendants reported it as fact;

b).     that the dead-heading pilot repeated the false allegations, but in fact he could not really see Plaintiff;

c).     that "We're dead" "sir, stop" was stated only by the woman in 13F, and not by others in the plane;

d).     that Plaintiff was standing up and getting things out of bags in overhead bins, but in fact he was not – he checked his skateboard and Plaintiff had nothing in the overhead bins;

e).     that Plaintiff was texting pictures of bombs even though no one saw any such thing because there were no such pictures and texts.  Only the woman in 13F claimed she thought she saw this but she also told Defendants that she could not see what the texts said, and she was not sure she saw bomb pictures, nonetheless Defendants' reported this as fact;

f).     that Defendants' flight attendant lied to the captain during the flight stating Plaintiff was in the bathroom for a long period of time when he was not -- even the woman in 13F corrected this false statement by a flight attendant and the flight attendant had to correct her statement;

g).     that Defendants instead of approaching Plaintiff and talking to him, asking what he had with him, moving Plaintiff away from the woman in 13F, and otherwise diffusing the situation, Defendants' flight attendants sent the woman back to sit next to Plaintiff and asked her to spy on Plaintiff and report back to Defendants, instead of Defendants ascertaining the facts for themselves;

h).     that the dead-heading pilot falsely reported Plaintiff was a very suspicious individual holding an item of great concern on board and showing very suspicious activity which, but in fact the dead heading pilot never saw, never observed, and never got out of his seat to verify any facts of diffuse any situation;

i).     that a Flight Attendant used as a basis to allege wrongdoing that Plaintiff "reached down" at one point and "reached in his pocket" at one point.  But

this Flight Attendant also admitted she could not actually see what he was doing, and even if she could, there is nothing wrong with reaching down to your carry-on or reaching in your pocket on a plane – behavior which happens millions of times a day on every flight;

k). that every passenger on every flight probably ever flown at some time during a flight reached down. There is nothing illegal or suspicious about reaching down – this is all any Defendant actually saw Plaintiff do; and

m). that Defendants falsely reported that they had to yell at Plaintiff to sit down. Plaintiff was seated at all times while the seat belt light was on – it was the woman passenger in 13F who got out of her seat and did so by crawling over Plaintiff who was seated and belted.

66. As the flight was descending for landing, the woman passenger in 13F again got up to get out of Row 13, with the baby, and changed seats. The seat belt light was on. The woman in 13F, crawled over Plaintiff and moved to another seat which was not her assigned seat. Flight attendants yelled at the woman with the baby to sit down. Flight Attendants did not speak to Plaintiff, yet Defendants falsely reported they repeatedly yelled at Plaintiff to sit down. Plaintiff was seated.

67. Once the woman and her baby were no longer in the window seat, Plaintiff reached down to his backpack, still properly stowed under the seat in front of him, to get his camera, the same camera shown above, the same camera Plaintiff carried on to the plane when he boarded, and the same camera Plaintiff put in his backpack when he went to sleep at the beginning of the flight. Plaintiff, as do millions of other New York City passengers hoping for a magnificent view of New York City and took his camera out to get a photo of the beautiful skyline.

68. Defendants and their employees, agents or contractors said nothing to Plaintiff.

69. The woman who moved from seat 13F, now seated in another seat, yelled at Plaintiff, "Don't do it".

70. No one else yelled and no one else repeated what the 13F woman said.

71.     Plaintiff responded to the woman who was looking at him and appeared to be yelling at Plaintiff, "What's going on?" and "Are you okay?"

72.     Plaintiff noticed the yelling woman was looking at his camera when she yelled, so Plaintiff put the camera on the floor by his bag, stopped looking at the woman, and looked forward. After Plaintiff placed his camera on floor, the woman stopped yelling.

73.     Another passenger sitting in the aisle seat ahead of Plaintiff asked the woman "Is everything is, okay?"

74.     None of Defendants and/or their employees, agents, or contractors of Defendants' approached Plaintiff, talked to Plaintiff, or asked him what was going on.

75.     After landing, passengers began getting their carry-on bags and Plaintiff got his backpack and camera off the floor.

76.     The same woman from 13F, who minutes earlier screamed at Plaintiff "Don't do it", now calmly asked Plaintiff to get her bag and scarf for her. Plaintiff politely retrieved the woman's bag and scarf and handed them to her.

77.     An announcement was made that everyone needed to evacuate immediately All passengers including Plaintiff were rushed out the front of the plane and down the inflatable slides.

78.     After sliding down, Plaintiff gathered with the other passengers on the tarmac who seemed calm but confused. The flight attendants were also still near the plane and still near the passengers, including Plaintiff. The flight attendants did not move away from the plane and passengers nor direct the passengers to do so.

79.     Plaintiff was with the other passengers, several of whom speculated there was a fire on the plane because they perceived the plane was hot.

80.     Several minutes went by as Plaintiff and the other passengers were standing together on the tarmac along with Defendants' crew and flight attendants.  Flight Attendants were captured on cell phone video, which was uploaded to the internet, standing and walking around the tarmac in the vicinity of the Plaintiff.

81.     Without warning, several emergency responders tackled Plaintiff, slammed him to the ground, jumped on his back, ripped his backpack off his body, yanked his camera out of his hands, and slammed his camera and other possessions to the ground.

82.     Defendants' and their employees, agents and contractors had pointed out Plaintiff to the responders as the subject of their allegations, which allegations were false.

83.     While pinned to the tarmac Plaintiff was being videoed and photographed, by countless cell phones including Defendants' flight attendants, and these photographs and videos were soon uploaded to the internet.  Plaintiff while pinned to the ground, was asked several questions such as "Do you know where you are?" and "What is today's date?"  Plaintiff was then put in handcuffs; he was yanked upright, and he heard responders say, "leave the bag, it's a suspicious package".  Plaintiff was then shoved to and into a police car, where he sat for 5 to 10 minutes.

84.     While sitting in the police car, Plaintiff was searched and his shoes were removed, searched, and then partially shoved back on his feet.  He was then strapped down and transported to lock up in a police station that was part of the airport.  He was immediately taken out of the police car and shoved into a jail cell.  He was again searched, all parts of his body patted down, and he was deprived of his possessions including his shoes and socks.

85.     He was shown no warrant; he was not read his rights; he was not asked for consent to a search; he was not allowed a phone call.

86.     Plaintiff was locked up in the jail cell, alone, for at least two and a half hours.  While waiting Plaintiff asked one officer walking past the cell what was going on and what did I do?  The officer sarcastically responded, "You were the one on the flight so you would know more than me."

87.     After more time elapsed, Plaintiff was offered only water, which he accepted.  He was given no other fluids, no food, and no amenities – not even a phone call during the many hours of incarceration.  All his possessions had been taken away including his shoes and still not returned.

88.     After more time elapsed EMT's came to the front of the cell and asked Plaintiff if he was on any medication or if his medical state had changed or if he needed any medical attention or was suicidal.

89.     Despite the passage of many hours, Plaintiff was still told nothing and allowed no communications, no phone call, and no lawyer.

90.     After the passage of many hours, Plaintiff was brought to an interrogation room, where he was told to sit down and wait for detectives to come.

91.     More time passed.

92.     Finally, three men entered the room.  The men identified themselves as an FBI agent and 2 detectives.

93.     The three men asked Plaintiff if he knew why he was locked up.  Plaintiff did not. The three men stated the airline reported him as acting suspicious, looking up bombs and how to make them, and having suspicious items on the plane.

94.     Plaintiff's cell phone, photos, texts, emails, and search sites were examined by the three men.  Plaintiff's camera and photographs thereon were searched and examined.  Plaintiff's music and podcasts were searched.  Plaintiff's groups and chats were searched.  All 3 men

questioned Plaintiff about medications, family members, roommates, as well as what he was doing in Indiana. The 3 men asked Plaintiff many inflammatory and insulting questions such as if he had access to guns, explosives, and bomb making materials.

95.    After the interrogation and search of his phone and cameras, and all electronic storage thereon, and after being subjected to many outrageous invasions of privacy, false suggestions of wrongdoing, and accusatory leading questions, all 3 men left.

96.    Again, Plaintiff sat in a jail cell, alone and waited.

97.    Finally, more, and different men came and stood in front of Plaintiff's cell and said there was a "misunderstanding".

98.    Plaintiff was forced to wait longer, still locked up in the jail cell. More time passed.

99.    Finally, the FBI agent came and took Plaintiff out of the cell. The man demanded Plaintiff stand up and take off his mask and be subjected to photographing. The FBI took mug shots of Plaintiff's face.

100.    Plaintiff was then escorted by police to his luggage, including the backpack which was left on the tarmac when Plaintiff was handcuffed and transported to jail. With Plaintiff's backpack were also Plaintiff's checked suitcase and the skateboard Plaintiff had checked upon boarding. The police told Plaintiff to pick up his baggage.

101.    Then, Plaintiff was put in another police car but was told nothing. The police car drove through the dark night.

102.    Then the police car stopped and the police told Plaintiff to take his possessions and get out.

103.    It was dark and very late at night. Plaintiff had been jailed for hours.

104.     Nothing else was said to Plaintiff by the officer and no explanation was given for what had been done to Plaintiff.

105.     Plaintiff discovered the police had stopped near a taxi stand.  Plaintiff was dumped out in the dark night and told him to find his own way home.

106.     Defendants, and none of their employees, agents, contractors, representatives, lawyers, PR people, customer representatives, or anyone else, ever explained or apologized to Plaintiff, not on October 9, 2021, and not to this day.

## FIRST CAUSE OF ACTION

(False Imprisonment/False Arrest/Wrongful Detention)

107.     All other allegations in this Complaint are incorporated by reference as though fully set forth herein.

108.     Defendants, by words and acts and those of its agents, contractors and/or employees, caused Plaintiff to be slammed to the ground, have large men pounce on his back, and to be handcuffed, incarcerated, questioned, searched, property seized and searched, interrogated, and jailed for hours, and deprived of food, telephone calls or communications, and suffer multiple violations of his rights.

109.     Defendants by their words and acts and those of their agents, contractors and/or employees and by instructing Air Traffic Control, the FAA, dispatch and/or law enforcement and first responders and others that Plaintiff had committed acts on the aircraft, possessed suspicious items, and was suspected of illegal acts and intentions caused Plaintiff to be restrained.

110.     Such restraints were performed intentionally due to acts and statements of Defendants' and those of their agents, contractors and/or employees.

111.     Such restraints were unlawful.

112.     Defendants and their agents, contractors and/or employees lacked probable cause, reasonable cause, or any cause whatsoever to have Plaintiff arrested, imprisoned, searched, questioned, or detained or to instruct anyone to treat Plaintiff in such manner.

113.     As a direct and proximate result caused or contributed to by Defendants' and their agents', contractors' and/or employees' false imprisonment, false arrest, and wrongful detention of Plaintiff, , Plaintiff has sustained actual and consequential damages, and has been subjected to outrageous and unconscionable treatment, all of which could have been avoided had Defendants assessed the situation and talked to Plaintiff, rather than asking a woman passenger with a baby to spy on and assess Plaintiff and report her assessment of the situation for Defendants.

114.     Plaintiff is entitled to judgment against Defendants for actual, consequential, and punitive damages.

## FOR A SECOND CAUSE OF ACTION

### (Defamation/Slander/Libel)

115.     All other allegations herein are re-alleged and incorporated by reference as though fully set forth herein.

116.     By reporting to air traffic control, law enforcement, first responders, dispatch and/or others that Plaintiff performed or was suspected of performing or intending to perform illegal activities on board its aircraft, Defendants and their agents, contractors and/or employees, through words, actions, and interstate and other communications, published certain information and statements concerning Plaintiff which were and are false, and caused Plaintiff's image to be published and repeated hundreds of thousands, if not millions, of times around the world, being slammed to the tarmac and arrested as a suspected terrorist attempted aircraft bomber.

117. Defendants freely allowed other passengers as well as Defendants' employees, agents, or contractors to remain near Plaintiff and to photograph, video and record Plaintiff, which images were also on social media.

118. Falsely accusing a person of a crime, and then causing that person's image to be broadcast as a suspected criminal tends to impeach the honesty, integrity, virtue, and reputation of that person.

119. The information and statements published by Defendants and their agents, contractors and/or employees, had a defamatory meaning concerning Plaintiff.

120. The information, statements, and communications of Defendants and their agents, contractors and/or employees were false, because Plaintiff did not commit any acts, did not intend to commit any such acts, nor did Plaintiff possess the alleged bomb making communications, bomb making photos, bombing devices, or any such instrumentalities, not on his person and not on his phone or camera or anywhere else. All allegations against Plaintiff were blatantly and unequivocally false, yet Defendants repeated those lies causing Plaintiff great harm.

121. As a direct and proximate result of Defendants' defamation, slander, and libel, Plaintiff has sustained legally presumed damages, including but not limited to embarrassment, humiliation, mental suffering, special damages, actual damages, and consequential damages, and has been subject to outrageous and unconscionable treatment.

122. Plaintiff is entitled to judgment against Defendants for actual damages, consequential damages, and punitive damages.

## FOR A THIRD CAUSE OF ACTION

(Assault and Battery)

123. All other allegations herein are re-alleged and incorporated by reference as though fully set forth herein.

124. Defendants and their agents, contractors and/or employees, through their words, actions, and other conduct, placed Plaintiff in reasonable fear of bodily harm.

125. Defendants and their agents, contractors and/or employees, through their words, actions, other conduct, and instructions and directions to air traffic control, first responders, law enforcement, and others, caused and contributed to forcible contact on the person of Plaintiff, and caused Plaintiff to be forced to the ground, his back and body pounced on by large men, his person to be kneed and sat upon, his body, clothes and shoes, possessions, communications and photographs searched, his person restrained, strapped down, wrists bound, deprived of food and liquids, shoved in and out of jail cells, and left incarcerated, cold and barefoot for hours in jail cells.

126. As a direct and proximate result of Defendants' assault and battery on Plaintiff, Plaintiff has sustained actual damages and consequential damages, and was subjected to outrageous and unconscionable treatment.

127. Plaintiff is entitled to judgment against Defendants for actual damages, consequential damages, and punitive damages.

## FOR A FOURTH CAUSE OF ACTION

(State Law Negligence)

128. All other allegations herein are re-alleged and incorporated by reference and though fully set forth herein.

129. Defendants, and each of them owed Plaintiff a duty of care.

130.    Defendants, and each of them, as a common carrier, owed Plaintiff the highest duty of care.

131.    Defendants, and each of them, must take precautions to protect their passengers, including from other travelers.

132.    The Federal Circuit in which this United States District Court is located, is the United States Circuit Court for the Second Circuit.   The Second Circuit has held that the FAA regulations do not pre-empt state law standards and New York law imposes a duty of reasonable care and Defendants, and each of them, as common carriers, and owners and operators of commercial aircraft, have a duty to protect passengers from dangers which are foreseeable.

133.    New York state law applies to this Cause of Action.

134.    Defendants, and each of them, breached their duty of care to Plaintiff.

135.    Defendants, and each of them, failed to take reasonable, or any, precautions to protect Plaintiff from dangers harms and hazards, and failed to take any steps to avoid or minimize the harm, which dangers, harm and hazards, and the damages resulting therefrom, were foreseeable.

136.    Plaintiff suffered damages as a proximate result of Defendants, and each of them, breached their duty to Plaintiff.

## FOR A FIFTH CAUSE OF ACTION

(Intentional Infliction of Emotional Distress)

137.    All other allegations herein are re-alleged and incorporated by reference as though fully set forth herein.

138.    On October 9, 2021, Plaintiff was, at the direction of Defendants and Defendants' employees, agents, and contractors, intentionally and/or recklessly mistreated, verbally assaulted,

and publicly and privately demeaned and humiliated, accused, incarcerated, searched, interrogated, assaulted and put in grave fear of injury and harm, physically battered, deprived of his rights, terrified, and Plaintiff's image caused to be flashed around the world, in video and photographs posted on social media, and in news reports, suggesting Plaintiff was planning to bomb an aircraft or committing other such acts.

139.    Defendants and Defendants' employees, agents and contractors, knew that their actions would likely result in Plaintiff suffering from harm due to mental and physical distress.

140.    Defendants and Defendants' employees, agents and contractors, were in a position of authority over Plaintiff that gave Defendants' both real and apparent power to affect Plaintiff's interests.

141.    The aforementioned conduct of Defendants and Defendants' employees, agents and contractors, was extreme and outrageous, far exceeding the bounds of decency normally tolerated in a civilized society.

142.    As set forth above, Defendants and Defendants' employees, agents and contractors, engaged in this conduct knowing that it would cause Plaintiff extreme emotional distress, or with conscious disregard of the likelihood of such an outcome.

143.    As a proximate result of the acts of Defendants and Defendants' employees, agents, and contractors, Plaintiff has suffered and will continue to suffer physical distress and severe emotional distress, including at the time of the events described herein, to and including to the present, and into the future.

WHEREFORE, Plaintiff requests judgment against Defendants and each of them, for actual damages, consequential damages, punitive damages, and any other damages as pled herein,

prejudgment interest, his cost of suit and attorney's fees incurred in this action, and for such other and further relief as this Court deems just and proper.

## **JURY TRIAL DEMAND**

Trial by jury is demanded on all counts, allegations, and causes of action herein so triable and as allowed by this Honorable Court.

Respectfully submitted this 16th day of August 2022.

<div style="margin-left:40%">

MOTLEY RICE LLC


_____
Donald A. Migliori, Esq.
(DM0589)
Mary Schiavo, Esq.
(*Pro Hac Vice to be requested*)
James R. Brauchle, Esq.
(*Pro Hac Vice to be requested*)
MOTLEY RICE, LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843)216-9000(phone)
(843)216-9540(fax)
dmigliori@motleyrice.com
mschiavo@motleyrice.com
jbrauchle@motleyrice.com

Attorneys for the Plaintiff

</div>